# EXHIBIT A

***EFILED**
Case Number 2021L 00056(
Date: 5/7/2021 2:04 PM
Thomas McRa(
Clerk of Circuit Cour
Third Judicial Circuit, Madison County Illinoi:

## IN THE CIRCUIT COURT
## OF THE THIRD JUDICIAL CIRCUIT
## MADISON COUNTY, ILLINOIS

| | | | |
|---|---|---|---|
| DESTIN JUPITER and DANA JUPITER | ) | | |
| Plaintiff, | ) ) ) | Cause No.: | 2021L 000560 |
| vs. | ) ) | | |
| MEAD JOHNSON & COMPANY, LLC, | ) ) | | |
| SERVE: Illinois Corporation Service Company 801 Adlai Stevenson Drive Springfield, IL 62703 | ) ) ) ) | | |
| And | ) ) | JURY TRIAL DEMANDED | |
| MEAD JOHNSON NUTRITION COMPANY, | ) ) | | |
| SERVE: CT Corporation System 208 So. Lasalle Street, Suite 814 Chicago, IL 60604 | ) ) ) ) | | |
| And | ) ) | | |
| ABBOTT LABORATORIES, | ) ) | | |
| SERVE: Illinois Corporation Service Company 801 Adlai Stevenson Drive Springfield, IL 62703 | ) ) ) ) | | |
| Defendants. | ) | | |

## COMPLAINT

Destin Jupiter and Dana Jupiter ("Plaintiffs") bring this Complaint and Demand for Jury

Trial (the "Complaint") against Mead Johnson & Company, LLC, Mead Johnson Nutrition

Company, and Abbott Laboratories (collectively, "Defendants"). Plaintiffs allege the following

upon personal knowledge as to Plaintiffs' own acts and experiences and, upon information and

belief, including investigation conducted by Plaintiffs' attorneys, as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This action arises out of the injuries suffered by Destin Jupiter when, as a premature infant, he was given Defendants' cow's milk-based infant feeding products. Defendants' products caused Destin to develop necrotizing enterocolitis ("NEC"), a potentially deadly life-altering disease that largely affects premature babies who are given cow's milk-based feeding products. As a result, Destin was forced to undergo surgery to remove a portion of his intestines and has continued to suffer long-term health effects.

2.      Plaintiffs Destin Jupiter and his mother, Dana Jupiter, bring this cause of action against Defendants to recover for injuries that are the direct and proximate result of Destin's consumption of Defendants' unreasonably dangerous cow's milk-based infant feeding products.

## PARTIES

3.      Destin Jupiter is a natural person and a resident of Louisiana.

4.      Dana Jupiter is a natural person and Destin's mother. Ms. Jupiter is a resident of Louisiana.

5.      Defendant Mead Johnson Nutrition Company is a corporation, incorporated under the laws of the State of Delaware. Its principal place of business is Illinois. Defendant Mead Johnson & Company, LLC, is a limited liability company, organized under the laws of the State of Delaware. Its citizenship is that of its sole member, Mead Johnson Nutrition Company. Defendants Mead Johnson Nutrition Company and Mead Johnson & Company, LLC, (together, "Mead") are manufacturers of cow's milk-based infant feeding products and market many of these products under the "Enfamil" brand name.

6. Defendant Abbott Laboratories ("Abbott") is a corporation, incorporated under the laws of the State of Illinois. Its principal place of business is in Illinois. Abbott is a manufacturer of cow's milk-based infant feeding products and markets many of its products under the "Similac" brand name.

## JURISDICTION AND VENUE

7. This Court has general jurisdiction over this action because both Mead Johnson and Abbot Laboratories maintain their principal place of business in Illinois and because Abbott Laboratories is incorporated in Illinois. 735 Ill. Comp. Stat. Ann. 5/2-209; *see also Rios v. Bayer Corp.*, 2020 IL 125020, ¶ 19 (June 4, 2020) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)).

8. Venue is proper in Madison County because Defendants conduct business there. 735 ILCS 5/2-101; 735 ILCS 5/2-102(a).

## FACTUAL ALLEGATIONS

### *Destin Jupiter's NEC Diagnosis*

9. Destin Jupiter was born prematurely at Woman's Hospital in Baton Rouge, Louisiana on May 9, 2002.

10. Destin was born at 36 weeks gestation, weighing just 5 pounds.

11. Although Destin's mother intended to breastfeed him, Destin was fed Similac and/or Enfamil cow's milk-based products shortly after birth and throughout his hospital stay.

12. Shortly after he first ingested Defendants' products, Destin developed NEC.

13. Destin was forced to undergo surgery to remove a portion of his intestines and suffered long-term health effects.

### *Cow's Milk-Based Feeding Products Are Known To Cause NEC*

14.     NEC is a devastating disease that is the most frequent and lethal gastrointestinal disorder affecting preterm infants. NEC develops when harmful bacteria breach the walls of the intestine, causing portions of the intestine to become inflamed and often to die. Once NEC develops, the condition can progress rapidly from mild feeding intolerance to systemic and fatal sepsis. Up to 30 percent of NEC-diagnosed infants die from the disease.

15.     Preterm and low-birth-weight infants are especially susceptible to NEC because of their underdeveloped digestive systems. Extensive scientific research, including numerous randomized controlled trials, has confirmed that cow's milk-based feeding products cause NEC in preterm and low-birth-weight infants, which in turn may lead to other medical complications, surgeries, long-term health problems, and death.

16.     For example, in one randomized, multicenter study of 926 preterm infants, NEC was *six to ten* times more common in exclusively cow's milk formula-fed babies than in exclusively breast milk-fed babies and *three times* more common in babies who received a combination of formula and breast milk. For babies born at more than 30 weeks gestation, NEC was *20 times more common* in those only fed cow's milk formula than in those fed breast milk.

17.     Another randomized controlled trial showed that preterm babies fed an exclusive breast milk-based diet were *90% less likely* to develop surgical NEC (NEC that requires surgical treatment), compared to preterm babies fed a diet that included some cow's milk-based products.

18.     Yet another study that analyzed the data from a 12-center randomized trial concluded that fortification of breast milk with a cow's milk-based fortifier resulted in a 4.2-fold increased risk of NEC and a 5.1-fold increased risk of surgical NEC or death, compared to fortification with a breast milk-based fortifier.

19.    A Surgeon General report, *The Surgeon General's Call to Action to Support Breastfeeding*, warns that, "for vulnerable premature infants, formula feeding is associated with higher rates of necrotizing enterocolitis." The report also states that premature infants who are not breastfed are *138% more likely* to develop NEC.

20.    The American Academy of Pediatrics, "an organization of 67,000 pediatricians committed to the optimal physical, mental, and social health and well-being for all infants, children, adolescents, and young adults," has advised that *all* premature infants should be fed either their mother's milk or, if their mother's milk is unavailable, pasteurized human donor milk. This recommendation is based on the "potent benefits of human milk," including "lower rates of . . . NEC."

21.    A multicenter, randomized, controlled trial found that premature and low-birth-weight infants fed an exclusive breast milk-based diet suffered NEC only 3% of the time while premature and low-birth-weight infants receiving cow's milk-based formula suffered NEC *21% of the time*.

22.    Another study conducted a randomized comparison of extremely preterm infants who were given either (a) a diet of breast milk fortified with a breast milk-based fortifier or (b) a diet containing variable amounts of cow's milk-based products. The babies given exclusively breast milk products suffered NEC 5% of the time. The babies given cow's milk products suffered NEC 17% of the time.

### *Safer, Nutritionally Superior Alternatives To Cow's Milk-Based Products Exist*

23.    A range of options are available that allow preterm and low-birth-weight infants to be fed exclusively human-milk-based nutrition. For example, in addition to the mother's own milk, an established network delivers pasteurized donor breast milk to hospitals nationwide.

Moreover, hospitals have access to shelf-stable formula and milk fortifiers derived from pasteurized breast milk.

24.     A diet based exclusively on breast milk and breast milk fortifiers provides all the nutrition necessary to support premature and low-birth-weight infants without the elevated risk of NEC associated with cow's milk-based products. For example, in a study analyzing preterm infants who were fed an exclusive breast milk-based diet until they reached 34 weeks, all 104 infants exceeded standard growth targets and met length and head-circumference growth targets, demonstrating that infants can achieve and mostly exceed targeted growth standards when receiving an exclusive breast milk-based diet. This is particularly true given the ability of breast milk-based fortifiers to provide the additional nutritional supplements necessary for adequate growth while receiving the protective benefits of a breast milk diet.

25.     Defendants' products not only pose a threat to infants' health, but also displace the breast milk they could otherwise receive. This displacement only increases infants' vulnerability to NEC, as studies show that breast milk protects against the disease. For example, a study analyzing 1,587 infants across multiple institutions, concluded that an exclusive breast milk-based diet is associated with significant benefits for extremely premature infants and that it produced no feeding-related adverse outcomes.

26.     For the above reasons, experts acknowledge that breast milk is the best source of nutrition for preterm infants and those at risk for NEC. Breast milk-based nutrition nourishes infants while creating a significantly lower risk of NEC.

27.     At the time Destin was fed Defendants' products, the science clearly demonstrated to Defendants that these products cause and greatly increase the likelihood that a baby will develop NEC, leading to severe injury and often death.

28.     Despite the scientific consensus that Defendants' cow's milk-based products present a dire threat to the health and development of preterm infants, Defendants have made no changes to their products or the products' packaging, guidelines, instructions, or warnings. Instead, Defendants have continued to sell their unreasonably dangerous products to unsuspecting parents and healthcare providers, generating huge profits as a result.

### *Abbott's False And Misleading Marketing Regarding Cow's Milk Based Infant Products*

29.     Abbott and Mead have aggressively marketed their cow's milk-based products as medically endorsed and nutritionally equivalent alternatives to breast milk, including prior to Destin's birth.

30.     Abbott's and Mead's marketing approach includes targeting the parents of preterm infants while they are still in the hospital with messages that Defendants' cow's milk formulas and fortifiers are necessary for the growth and development of their vulnerable children. Often these tactics implicitly discourage mothers from breastfeeding, which reduces the mother's supply of breast milk. *None* of Defendants' marketing materials, including their promotional websites, reference the science showing how significantly their products increase the risk of NEC.

31.     Numerous studies have shown the detrimental impact of formula advertising on the rates of initiation and continuation of breastfeeding, including studies that show that as "hand feeding" (non-breastfeeding) advertisements increase, reported breastfeeding rates decrease in the following year.

32.     Undoubtedly aware of the impact of their advertising, Defendants, along with other formula manufacturers, are willing to spend massive sums to disseminate this message, with one study estimating that the formula manufacturers collectively spent $4.48 billion on marketing and promotion in 2014 alone.

33.     Recognizing the abuse and dangers of the infant formula marketing, in 1981, the World Health Assembly—the decision-making body of the World Health Organization—developed the International Code of Marketing of Breast-milk Substitutes ("the Code"), which required companies to acknowledge the superiority of breast milk, the negative effect on breastfeeding of introducing partial bottle-feeding, and the difficulty of reversing the decision not to breastfeed. The Code also forbade advertising or other forms of promotion of formula to the general public, as well as providing sample products to mothers or members of their families.

34.     While Abbott and Mead acknowledge the Code on their websites and claim to support the effort to encourage mothers to breastfeed for as long as possible, this is little more than lip service. Instead, Defendants' aggressive marketing exploits new parents' darkest fears—that the nutrition they are supplying to their child will not provide the best chance of survival—while wholly failing to warn that their products come with a significantly increased risk of NEC.

35.     For example, Abbott's website, on a paged titled "Infant Formula Marketing," states: "We agree with the World Health Organization that breastfeeding provides the best nutrition for babies, and we support its goal to increase breastfeeding. We also recognize that for infants who aren't breastfed—for medical reasons or otherwise—**infant formula is the only appropriate, safe alternative** to meet babies' nutritional needs." This statement ignores the existence of donor milk, as well as human milk-based formula.

36.     Abbott markets and sells multiple products specifically targeting preterm and low-birth-weight infants, including Liquid Protein Fortifier, Similac NeoSure, Similac Human Milk Fortifiers, Similac Special Care 20, Similac Special Care 24, Similac Special Care 24 High Protein, and Similac Special Care 30. In advertising these products, Abbott emphasizes the products' purported ability to assist underdeveloped babies in reaching their growth targets. For

example, on the since-edited webpage regarding Similac NeoSure, Abbott noted: "Your premature baby didn't get her full 9 months in the womb, so her body is working hard to catch up. During her first full year, feed her Similac NeoSure, a nutrient-enriched formula for babies who were born prematurely, and help support her development." Yet, no mention was made of the accompanying significantly increased risk of NEC. At some point, the website was edited to remove this statement. However, upon information and belief, the statement remained on the website until at least December 2020.

37.    Mead markets and sells multiple products specifically targeting premature infants, including Enfamil NeuroPro EnfaCare Infant Formula, Enfamil Premature Infant Formula 24 Cal High Protein, Enfamil Premature Infant Formula 30 Cal with Iron, Enfamil Premature Infant Formula 24 Cal with Iron, Enfamil Premature Infant Formula 20 Cal with Iron, Enfamil 24 Cal Infant Formula, and Enfamil Human Milk Fortifier (acidified liquid and powder). In advertising these products, Abbott emphasizes the purported similarities between its formula and breast milk, while failing to include any information about the nutritional deficits and dangers that accompany formula use. For example, the since-edited webpage for Enfamil Enfacare stated: "Premature babies fed Enfamil® formulas during the first year have achieved catch-up growth similar to that of full term, breastfed infants" and "Includes expert-recommended levels of DHA and ARA (important fatty acids found naturally in breast milk) to support brain and eye development."

38.    One Enfamil advertisement, introducing a new product line called Enfamil NeuroPro, is entirely focused on favorably comparing Enfamil's formula to breast milk, without any mention of the product's extreme risks. Indeed, the terms "human milk" and "breast milk" are used 13 times in the advertisement, including in such statements as "for decades human milk has inspired the advancements in Enfamil formulas and now through extensive global research,

we are taking an even closer look at human milk" and "only Enfamil NeuroPro has a fat blend of MFGM and DHA previously found only in breast milk." The webpage for the product has made similar manipulative claims, stating "Enfamil is backed by decades of **breast milk research** and multiple clinical studies" and it claims that "to create our best formulas, we collaborated on some of the most extensive **breast milk studies** to date" (emphasis added).

39.     Formula manufacturers have long used their relationships with hospitals and the discharge process to encourage parents to substitute formula for breast milk. They offer free formula, coupons, and even entire gift baskets to parents in hospitals, medical clinics, and residential charities where out-of-town families stay while their babies receive long-term treatment in the NICU.

40.     Through this early targeting, Defendants create brand loyalty under the guise of a "medical blessing," in hopes that new parents continue to use formula after they leave the hospital, resulting in increased expense for parents, significantly increased risk for babies, and increased profit for Defendants. Defendants' gift baskets send confusing signals to mothers who are simultaneously being encouraged to breastfeed by their health care professionals, and they have been shown to negatively impact breastfeeding rates.

41.     Further, when Defendants recognized a shift in the medical community towards an exclusive breast milk-based diet for premature infants, Abbott developed a product called "Similac Human Milk Fortifier" and Mead developed "Enfamil Human Milk Fortifier." These names are misleading in that they suggest that the products are derived from breast milk, when, in fact, they are cow's milk-based products. One study, for example, found that only 8.8 percent of parents surveyed in the NICU interpreted "human milk fortifier" as potentially meaning a cow's milk-based product. The packaging appears as:






42.     Defendants have designed powerful misleading marketing campaigns to deceive parents into believing that: (1) cow's milk-based products are safe, including for preterm infants; (2) cow's milk-based products are equal, or even superior, substitutes to breast milk; (3) cow's milk-based products are necessary for proper growth and development of preterm infants; and (4) physicians consider Defendants' cow's milk-based products a first choice. This marketing scheme is employed despite Defendants knowing of and failing to warn of the extreme risk of NEC and death that cow's milk-based products pose to preterm infants like Destin.

### *Defendants' Inadequate Warnings*

43.     Although Mead promotes an aggressive marketing campaign designed to convince parents that its cow's milk-based products are safe and necessary for the growth of a premature infant, the product is in fact extremely dangerous for premature infants. Enfamil products significantly increase the chances of a premature infant developing potentially fatal NEC.

44.     The products Enfamil markets specifically for premature infants are commercially available at retail locations and online. No prescription is necessary.

45.     Despite knowing of the risk of NEC, the packaging of Mead's products does not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with Enfamil's products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

46.     Mead cites no medical literature or research to guide the use of its products.

47.     Despite knowing of the risk of NEC, Mead did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Mead likewise did not provide instructions or guidance for how to avoid NEC.

48.     Mead deceived the public, parents, physicians, other medical professionals, and medical staff into believing that Enfamil products were a safe and necessary alternative, supplement and/or substitute to breast milk.

49.     Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Mead failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

50. Like Mead, Abbott promotes an aggressive marketing campaign designed to make parents believe that its products are safe and necessary for the growth of premature infants, despite the products in fact being extremely dangerous for premature infants. Abbott's products significantly increase the chances of a premature infant getting potentially fatal NEC.

51. The products Abbott markets specifically for premature infants are available at retail locations and online. No prescription is necessary.

52. Despite knowing of the risk of NEC, Abbott did not warn of the significantly increased risk of NEC (and resulting medical conditions, and/or death) associated with its products, or of the magnitude of this increased risk. Abbott likewise did not provide instructions or guidance for how to avoid NEC.

53. Abbott deceived the public, parents, physicians, other medical professionals, and medical staff into believing that its products were a safe and necessary alternative, supplement and/or substitute to breast milk.

54. Despite knowing that its products were being fed to premature infants, often without the parents' informed consent, Abbott failed to require or recommend that medical professionals or hospitals inform parents of the significant risk of NEC or to require that parental consent be obtained prior to the products being fed to their babies.

### *Safer Alternative Designs*

55. Defendants' cow's milk-based products made specifically for premature infants are unreasonably unsafe for those infants. Defendants could have used pasteurized breast milk instead of cow's milk in their products, which would have produced a safer product.

56. Prolacta Bioscience manufactures and sells breast milk-based feeding products, specifically designed for preterm infants, which contain no cow's milk. This alternative design

provides all the necessary nutrition for growth and development that cow's milk-based products provide, without the same unreasonably dangerous and deadly effects.

57. On information and belief, Abbott and Mead were aware of the significantly increased risk of NEC and death associated with their cow's milk-based products and instead of warning of the dangers, or removing them altogether, Abbott and Mead have continued to use cow's milk as the foundation of their products.

## COUNT I: STRICT LIABILITY FOR DESIGN DEFECT
### (Against All Defendants)

58. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

59. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to manufacture, sell, and distribute their products in a manner that was not unreasonably dangerous.

60. Abbott and Mead knew that their products would be used to feed premature infants like Destin and knew (or reasonably should have known) that use of their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, and that such use was therefore unreasonably dangerous to premature infants. Nonetheless, they continued to sell and market their defective products as appropriate for premature infants.

61. Destin ingested Abbott and/or Mead's unreasonably dangerous cow's milk-based products. The risks of feeding those products to Destin outweighed the benefits. An ordinary consumer would not expect those products to carry a significant risk of serious injury and death from NEC.

62.     Abbott and Mead knew (or reasonably should have known) that breast milk-based nutrition did not carry the same risks of NEC, serious injury, and death that Defendants' products do.

63.     Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

64.     Abbott and Mead did not develop a human-milk based product that was safer for premature infants and did not reformulate their products to reduce the risk of NEC, serious injury, and death, even though doing so was economically feasible and even though pasteurized breast milk was an available alternative.

65.     Abbott and/or Mead's products were fed to Destin, which directly caused Destin's NEC and led to surgery and long-lasting injury.

66.     As a further direct result, Ms. Jupiter incurred medical expenses, and suffered significant emotional distress, loss of income, and other harms.   Her life has been significantly affected by Destin's injury.

## COUNT II: STRICT LIABILITY FOR FAILURE TO WARN
### (Against All Defendants)

67.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

68.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide adequate warnings or instructions about the dangers and risks associated with the use of their products with preterm infants, specifically including but not limited to the risk of NEC, serious injury, and death.

69.     Abbott's and Mead's duty to warn is part of its general duty to design, manufacture, and sell their infant products in a manner that is reasonably safe for their foreseeable uses. By designing their products with cow's milk-based ingredients, Abbot and Mead undertook a duty to warn of the unreasonable risk of harm posed by those ingredients, specifically including the significantly increased risk of NEC, severe injury, and death. The failure to warn makes the products at issue in this litigation unreasonably dangerous.

70.     Specifically, Abbott and Mead breached their duty to warn of the foreseeable risks of the infant products at issue in this litigation because they knew or should have known that their cow's milk-based premature infant products would be fed to premature infants like Destin, and that their products might cause those infants to develop NEC, severe injury, or death, yet it failed to provide adequate warnings of those risks. Among other risks, Defendants:

a.  Failed to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or

b.  Failed to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like Destin; and/or

c.  Carried warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d.  Failed to carry a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failed to disclose well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failed to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

g. Failed to provide a warning in a method reasonably calculated or expected to reach the baby's parents; and/or

h. Failed to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

71. Abbott's and Mead's products contained cow's milk at the time they left the manufacturing facility.

72. As a direct result of the inadequacy of the warnings and the pervasive marketing campaigns suggesting the safety and necessity of their products, Destin was fed cow's milk-based products, which caused him to develop NEC.

73. Had physicians and healthcare providers known of the extreme risk associated with feeding premature infants cow's milk-based formula, they would not have fed Destin those products. Had Ms. Jupiter known of the significant risks of feeding Destin cow's milk-based formula, she would not have allowed such products to be fed to her child.

74. As a further direct result, Ms. Jupiter incurred medical expenses, and suffered significant emotional distress, loss of income, and other harms. Her life has been significantly affected by Destin's injury.

## COUNT III: NEGLIGENCE
### (Against All Defendants)

75.    Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

76.    Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to exercise reasonable care to design, test, manufacture, inspect, and distribute a product free of unreasonable risk of harm to users, when such products are used in their intended manner and for their intended purpose.

77.    At all times relevant to this action, Ms. Jupiter, Destin, and his health care providers used the products at issue in their intended manner and for their intended purpose.

78.    Abbott and Mead, directly or indirectly, negligently, and/or defectively made, created, manufactured, designed, assembled, tested, marketed, sold, and/or distributed the cow's milk-based infant products at issue in this litigation and thereby breached their duty to the general public and Plaintiffs.

79.    Specifically, although Abbott and Mead knew or reasonably should have known that their cow's milk-based infant products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by:

> a.  Failing to warn that cow's milk-based products significantly increase the risk of NEC, severe injury, and death in those babies; and/or
>
> b.  Failing to warn that cow's milk-based products are unsafe and/or contra-indicated for premature infants like Destin; and/or
>
> c.  Carrying warnings and instructions that are severely inadequate, vague, confusing, and provide a false sense of security in that they warn and instruct

specifically on certain conditions, but do not warn of the significantly increased risk of NEC and death; and/or

d. Failing to carry a large and prominent "black box"-type warning that their cow's milk-based products are known to significantly increase the risk of NEC and death when compared to breast milk in premature infants; and/or

e. Failing to provide well-researched and well-established studies that linked cow's milk-based products to NEC and death in premature infants; and/or

f. Failing to insert a warning or instruction to healthcare professionals and other medical staff in the hospital that parents should be provided information necessary to make an informed choice about whether to allow their babies to be fed Defendants' products, notwithstanding their substantial risks; and/or

g. Failing to provide a warning in a method reasonably calculated/expected to reach the baby's parents; and/or

h. Failing to provide statistical evidence showing the magnitude of increased risk of NEC in premature infants associated with cow's milk-based products.

80. In addition, although Abbott and Mead knew or reasonably should have known that their cow's milk-based products significantly increased the risk of NEC, serious injury, and death, they failed to act in a reasonably prudent manner and breached their duty by failing to perform the necessary process of data collection, detection, assessment, monitoring, prevention, and reporting or disclosure of adverse outcomes in infants who ingest their products.

81. As a direct result of Defendants' failure to act in a reasonably prudent manner and their breach of duty, Destin was fed cow's milk-based products, which caused him to develop NEC.

82.     Had Abbott and Mead satisfied their duties to the consuming public in general, Destin would not have been exposed to their unreasonably dangerous cow's milk-based products.

83.     As a further direct result, Ms. Jupiter incurred medical expenses, and suffered significant emotional distress, loss of income, and other harms.   Her life has been significantly affected by Destin's injury.

## COUNT IV: INTENTIONAL MISREPRESENTATION
### (Against All Defendants)

84.     Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

85.     At all times relevant to this action, Destin (and his caretakers) used the products at issue in their intended manner and for their intended purpose.

86.     Abbott and Mead, as the manufacturers and/or sellers of the infant products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

87.     Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein.

88.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time Destin was fed their products:

       a.   That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were

unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

b. That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

c. That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

d. That cow's milk-based products are safe for premature infants; and/or

e. That cow's milk-based products are necessary for optimum growth; and/or

f. That cow's milk-based products are similar or equivalent to breast milk; and/or

g. That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

h. That their products were based on up-to-date science, which made them safe for premature infants; and/or

i. Omitting the material fact that their products significantly increase the risk of NEC in premature infants.

89.     Abbot and Mead knew or reasonably should have known those misrepresentations to be false.

90.     Those misrepresentations were intended to, and in fact did, induce hospitals and health care providers, including Destin's hospital and health care providers, to provide their infant products to babies, including Destin.

91. Defendants' misrepresentations induced Ms. Jupiter to allow her child to be fed Abbott's and Mead's infant products, in reliance on all the messaging she received about formula feeding, including, directly or indirectly, Defendants' messaging. Had Abbott and Mead not committed these intentional misrepresentations, Destin would not have been exposed to their unreasonably dangerous cow's milk-based products.

92. As a direct result, Abbott and Mead Johnson's products were fed to Destin, causing his NEC and the subsequent health impacts.

93. As a further direct result, Ms. Jupiter incurred medical expenses, and suffered significant emotional distress, loss of income, and other harms. Her life has been significantly affected by Destin's injury.

## COUNT V: NEGLIGENT MISREPRESENTATION
### (Against All Defendants)

94. Plaintiffs incorporate by reference each of the preceding paragraphs as if fully set forth herein.

95. At all times relevant to this action, Destin used the products at issue in their intended manner and for their intended purpose.

96. Abbott and Mead, as the manufacturers and/or sellers of the products at issue in this litigation, owed a duty to the consuming public in general, and Plaintiffs in particular, to provide truthful, accurate, fulsome information about the risks and benefits of using their products when used in the intended manner and for the intended purpose.

97. Abbott and Mead breached their duty through misrepresentations made to consumers, physicians, and medical staff in their advertising and promotional materials, as described in previous paragraphs and incorporated herein.

98.     Specifically, upon information and belief, Abbott and Mead made the following false statements of material fact on an ongoing and repeated basis and prior to the time Destin was fed their products:

   a.  That their cow's milk-based products were safe and beneficial for premature infants when they knew or should have known that their products were unreasonably dangerous and cause NEC, serious injury, and death in premature infants; and/or

   b.  That their cow's milk-based products were necessary to the growth and nutrition of premature infants, when they knew or should have known that their products were not necessary to achieve adequate growth; and/or

   c.  That their products have no serious side effects, when they knew or should have known the contrary to be true; and/or

   d.  That cow's milk-based products are safe for premature infants; and/or

   e.  That cow's milk-based products are necessary for optimum growth; and/or

   f.  That cow's milk-based products are similar or equivalent to breast milk; and/or

   g.  That their products were safe and more like breast milk than other infant products and that they had removed the harmful ingredients of cow's milk when, in fact, the cow's milk in their products was still capable of causing NEC, serious injury, and death; and/or

   h.  That their products were based on up-to-date science, which made them safe for premature infants; and/or

   i.  Omitting the material fact that their products significantly increases the risk of NEC in premature infants.

99.     Abbot and Mead were negligent or careless in not determining those representations to be false.

100.    Those misrepresentations were intended to and did in fact induce hospitals and health care providers, including Destin's hospital and health care providers, to provide their products to babies, including Destin.

101.    Defendants' misrepresentations induced Ms. Jupiter to allow her child to be fed Abbott's and Mead's infant products, in reliance on all the messaging she received about formula feeding, including, directly or indirectly, Defendants' messaging. Had Abbott and Mead not committed these negligent misrepresentations, Destin would not have been exposed to their unreasonably dangerous cow's milk-based products.

102.    As a direct result, Abbott and Mead Johnson's products were fed to Destin, causing his NEC and the subsequent health impacts.

103.    As a further direct result, Ms. Jupiter incurred medical expenses, and suffered significant emotional distress, loss of income, and other harms.  Her life has been significantly affected by Destin's injury.

## COUNT VI: LOSS OF CONSORTIUM – DANA JUPITER
### (Against All Defendants)

104.    Plaintiff incorporates by reference each of the preceding paragraphs as if fully set forth herein.

105.    Loss of filial consortium is a derivative claim. It is derivative of each of the claims and allegations above.

106.    At all relevant times Ms. Jupiter was Destin's lawful mother.

107.    As a result of Defendants' tortious conduct, Ms. Jupiter suffered a loss of affection, companionship, society and consortium of her son Destin.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

108.   For compensatory damages in an amount to be proven at trial;

109.   For damages for past, present, and future emotional distress, loss of enjoyment of life, pain and suffering, mental anguish, loss of consortium, and other non-economic losses sustained as a result of Defendants' conduct;

110.   For past, present, and future out-of-pocket costs, lost income and/or lost revenue, and/or lost profits, and/or lost business opportunity, lost earning capacity, and costs related to medical or mental health treatment which have or may be recommended;

111.   For interest as permitted by law;

112.   For attorney's fees, expenses, and recoverable costs incurred in connection with this action; and

113.   For such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all claims triable.

Dated: May 7, 2021

Respectfully submitted,

HOLLAND LAW FIRM, LLC

*/s/ Eric D. Holland*
ERIC D. HOLLAND #06207110
ROBERT J. EVOLA (#6242860)
211 North Broadway, Suite 2625
St. Louis, MO  63102
314-241-8111 Telephone
314-241-5554 Facsimile
eholland@hollandtriallawyers.com
revola@hollandtriallawyers.com

ANN E. CALLIS (#6203933)
HOLLAND LAW FIRM, LLC
1324 Niedringhaus Avenue
Granite City, Illinois 62040
618-452-1323 Telephone
618-452-8024 Facsimile
acallis@hollandtriallawyers.com

and

KELLER LENKNER LLC
Travis Lenkner (#6311545)
Ashley Keller (#6300171)
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220
tdl@kellerlenkner.com
ack@kellerlenkner.com

*Attorneys for Plaintiff*